We want to welcome you here this morning. We have a very large docket today. So we will appreciate it if you keep within our time limits. And, of course, you probably know when the yellow light comes on, you have two minutes left or possibly less, two minutes. And then when the red light comes on, you may conclude your remarks unless you're answering a question from the court. We're familiar with your briefs. We may not have gotten into the entire record at this point. So we appreciate citations to the record where those are possible. And with that, we call case number 15-20025, United States v. Sanjar. And hear first from Mr. Jarman. Ms. Jarman, excuse me. May I please the court? Yes, ma'am. My name is Yolanda Jarman, and I represent Chandra Nunn in this case. All the co-defendants in this case have adopted one another's briefs. As to Ms. Nunn, I would like to begin with count six, the conspiracy to pay health care. I just want to make an observation, and we don't need to get in particular. We'll work it out. But, you know, it's one thing to adopt someone's brief, but if it's a factual matter and it just pertains to a certain person, you can't adopt that. But we'll sort all that out in writing the opinion. I'm aware of the factual situation, and that is why I'm arguing the facts that are unique to Ms. Nunn under the sufficiency of evidence argument. In this case, the government would have had to prove that Ms. Nunn paid illegal kickbacks to some of the patients at Spectrum. And here's where the district court made an error. Wasn't there all this evidence that she was giving out cash in envelopes? I mean, I think your client actually has one of the better sufficiency arguments on the health care fraud because there's nothing, no direct evidence certainly that she knew about the false claims being made to Medicare, but it does seem like there's plenty of evidence on the kickbacks for her. I argue in my brief, and Ms. Nunn maintains, that the evidence that was brought against her on the kickback issue is unreliable. The district court said that she found the evidence reliable primarily because she believed the lawyer was arguing that the witnesses were unreliable because of their mental conditions. However, the witnesses were not unreliable because of their mental conditions. They were unreliable because they changed their statements based upon whether the government was asking the questions or the defense lawyers were asking the questions. Isn't that a jury, a quintessential jury issue, credibility? If there were inconsistent statements, it would be a credibility issue. But in this case, it's more than a credibility issue because each witness, about five of them brought against Ms. Nunn, actually changed their testimony related to whether they received kickbacks from Ms. Nunn before they left their testimony. So it's more than just inconsistencies. In some cases, for example, Mr. Charles Chuck Roberts, he said that he was being paid to bring patients by Ms. Nunn, but he would give half of his payment to Sean Manning and half to Ms. Nunn. Well, if you add the two, half plus half is one. That would mean that he received no payments at all. So when you look to the brief, page 7 through 11, we detail in the brief how each witness actually changed their testimony, not just inconsistent, but actually admitted that they never received kickbacks when questioned by the defense lawyer. Second, we want to argue as to the overall conspiracy to commit health fraud. Here the government would have had to prove that there were false claims. And based upon the case law in this circuit, in order for the government to prove that there were false claims, there would have to be medical expert testimony. Here the government brought forth Dr. Patrick Triplett and Yvonne Lucky. Both of those witnesses testified to the purpose and function of a PHCP and LCDs. Basically, they talked about the function and how the payments were to occur and when and how patients were to receive treatment. With Medicare fraud, though, there were two separate theories. One was these people weren't even diagnosed with these psychological conditions, at least the acute conditions. That's the whole medical necessity issue, which you're saying they needed expert testimony for. But putting that aside, wasn't there a whole other theory supported by a lot of evidence that even if these people needed that treatment, it wasn't provided? I think it was called a Mickey Mouse facility, basically just treating it like a daycare. So why wouldn't the evidence be sufficient on that regardless of whether these people actually had the medical conditions? Because in this case, in the medical care case such as this one, the statute says that it's up to the treating physician to determine which care is needed by the patient. And there's no direct or circumstantial evidence in this case. Let me ask my question another way. If these people had the worst psychological conditions you can have, wouldn't it still be fraud to charge Medicare for these treatments when, in fact, they're sitting there watching TV all day? There was only one witness in this case who said that maybe he was watching television over a weekend or so. And then on cross-examination, he changed his testimony that he really couldn't remember as to whether that occurred or not. But in terms of the dearth of the evidence in this case, there was no direct or circumstantial evidence that the treatments that were received were inappropriate or were not of medical necessity. I see that my time has expired. No, you've got 20 seconds. So, based upon Wilford v. Banowski, this court has already said that the medical necessity or lack thereof cannot be determined by a patient. And in this case, the government offered evidence from the patients themselves that testified directly that whether they needed the treatment or didn't need the treatment or thought that their treatment was appropriate for them. Thank you for that. Thank you very much. Okay. Mr. Esmeyer. Yes, Your Honor. May it please the Court, I am Mike Esmeyer, Sr. for Manzar Sanjar, for whom the case is named. And it's not often that I get to argue both the Fourth, Fifth, and Sixth Amendments. I intend to talk to the Court today about the suppression and about the statement in Agent Kirk. Of course, the suppression hearing goes to the Fourth Amendment. And what's so exciting or the reason that the suppression hearing and the Fourth Amendment, they always say, is swinging for the fences. But it's not in this case. And let me tell you why. This was a minority-owned PHP, CMHC, Community Mental Health Facility, that was licensed by the State of Texas, that had over 200 active participants, patients, at the time of the raid, that had treated over 800 participants at the time of the raid, that even the judge stated that these people are mentally ill, the witnesses that were provided by the government. This clearly, she's clearly mentally ill. Some of these people that the government called are clearly crazy. That's what we got, lots of crazy. That's a record at 8452 and 8453. The taking out of a hospital or partial medical facility, a PHP, in a minority community is egregious. When it is done improperly, the State of Texas has a method to terminate a CMHC. The government, federal government, has a method. I believe it's found at 42 CFR Part 489.2 C2, Chapter 4, Parts 400 and 410. By this raid, they shut down this hospital. They did not allow the patients, their files, to take to another facility. They did not come in and seek to clarify the matter. And what did they do that on? The affidavits of two disgruntled former employees, one of whom, at least one of whom, was under indictment and working off a deal. And two mentally ill patients. And it was based on, the particularization of this is based on, first of all, the period of time, 2006 to the current. That's all the records of Spectrum. It didn't open until 2006. And they had no testimony about anything being wrong in 2006. No testimony, no probable cause. And it only goes to a couple of patients. But they said, the warrant's execution could be seized, including documents relating to patient files, bills, invoices, and claims for payment for services documents concerning the providing of PHP services by Spectrum, Sujati, and Sanjar, and patient correspondence regarding Medicare and Medicaid, and all the financial records, books, and records and documents relating to Spectrum, Sujati, and Sanjar. And the government says, well, we were particularized. We didn't take Dr. Brahms. Well, there was also a lady doctor there. They took her files. They say they didn't take the drug files. But the record is replete with the government cross-examining, particularly in regards to Ms. Defendant Maine, from the drug files. Even if you're right that it wasn't particular enough, how do you get around good faith, which would say you don't apply the exclusionary rule if the agents had good faith to believe a magistrate judge? How can it be good faith to go in and take nearly every file in a hospital proceeding? How can it be good faith to take patient files that are protected under HIPAA and other rules? How can it be good faith? Because a magistrate judge said you could? That's … I mean, that's what the good faith exception is based on. If a judge said this is okay, agents go out there and act reasonably based on what a judge said is okay. Now, there was a dispute as to whether or not the magistrate actually saw the affidavits. The judge settled that dispute against me. But when you went on PACER, the files that they presented as what was presented to the magistrate did not even include the attachments, which was the reason I made a Grohl argument to begin with, because that was the facts in that case, was they didn't have the attachments. But I don't think that good faith includes either from the magistrate or the agents going in. They grabbed files out of the laundry room. They grabbed everything they possibly could. There was nothing left except Dr. Brom's, and they said, well, it's two and a half file folders. I couldn't understand that line in their brief, but what they're talking about was Brom's files included two and a half file folders. So there were over 200 boxes of patient files, and I'm not sure the magistrate understood what a PHP was, how many files were involved, how many patient files were involved, and that the patients weren't going to be able to get those files back. These people, one of which was in the indictment, she had been found mentally ill before coming to Spectrum, and she went to two PHPs after Spectrum, which leads into the, as the court noted before, Hakimi and Nunn are in count one solely because of the kickbacks, quote, unquote. And so they have no play in the hospitalization period, whether it's valid or not. In health care, Medicare fraud cases are pretty common. Do you have any cases or even just examples where the search warrants are only limited to certain patient files? That would be United States v. Lanzar, Sixth Circuit. They actually had a patient list, which would make this much more particularized, particularly since their probable cause is only as to certain patients. And United States v. Lanzar also said if the patient name wasn't on the list, then they could not use that particular patient file. Is that in your brief? Is that cited in your brief? Yes, Your Honor. The other thing I want to talk about is the statement with Agent Kirk. And the main thing before that is this Court has not ruled on tantamount to introduction. In Garcia, it's mentioned, but the ruling's not made. This was a talking head. They put this gentleman up there, Agent Kirk, that the report was written by Agent Bradley Cooper. Kirk said he'd reviewed this a dozen times. So I should have been able to get it in under Rule 807 or 612 or 106. Even if that was error, why was that harmful error? I'm sorry, Your Honor. Why would that have been a harmful error? Because they used this statement to create the deliberate ignorance charge, because they used it in closing arguments not once but twice. Yeah, but, I mean, how could your client have flown under the deliberate ignorance? I mean, been convicted on that as opposed to the direct evidence? As an example, Your Honor, he said, Sanjar said, I don't go into that. I don't look for that. Well, he didn't look for that because it's not his job. He's a doctor. He's got somebody else that's in charge of running the show. It was his clinic, wasn't it, his hospital? It was his clinic, but, for instance, this is a group therapy. He didn't do group therapy. Terry Moore did group therapy. He would give treatment to the patients, but the things they complained about were not within his ballywick. His was to take medical care. I'm sorry, I've overstated. That's okay. Thank you. All right, Ms. Schmucker. Good morning. Good morning. I'm actually representing Adam Main, but I am going to talk a little bit about some issues that affect more than just him. The Pinkerton instruction that was given to the jury, the problem in this case, which is fairly unique, is that the Pinkerton instruction was given and also the aiding and abetting instruction were given. And you have the issue then of whether the jury might have read the Pinkerton instruction to lower the aiding and abetting intent element to foreseeable instead of something that was foreseen. The authority is sort of all over the place. There's nothing really 100% on point with this. There's a couple of cases where the Pinkerton instruction was given, but no aiding and abetting instruction was given. And those were cited by the government. One of them is the Jimenez case, which, Judge Jones, you were on that case. The other one is the Alanis case, which, actually, I was counsel of record for Magana on that case. And in that case, with both instances, they found that the Pinkerton instruction was okay. Neither one of those cases were health care fraud cases. Then you go to the inadequate aiding and abetting instruction, and we have Rosemond. That's the Supreme Court case that was decided while this case was in the trial court. Actually, if you go look at the dates, the day before Rosemond was issued, the jury conference in this case took place. Two days after Rosemond was issued, that's when the aiding and abetting instruction was given in this case, and it was inadequate. It was inadequate because when they were talking about the element which requires some association with the other parties, it talked about no knowledge, not no prior knowledge. And that was specifically the point that was brought up in Rosemond. So in this case, we have it both in inadequate aiding and abetting instruction and the Pinkerton instruction. And the only case that I find that even goes near that is the Saunders case, which was cited by also the government. The problem with the Saunders case for this court is it's not a published opinion, so it's not precedential. It also does not address the issue we're talking about here, which is whether the Pinkerton instruction expands the aiding and abetting liability or at least can be read to do so by the jury. And so there really is nothing for this court to go on except for its own judgment about whether this is possible. And I suggest that it is because at the end of each of the conspiracy theory instructions, count one and count six, the very last thing is the Pinkerton instruction. And then the judge goes right into the substantive instructions for the special instructions for the substantive offenses, two through five, which were the Medicare fraud, and then seven through 11, which were the kickback. Even apart from the aiding and abetting issue, I think at least one of the defendants, it might have been hard to keep track, Sondra or Hakimi, argues that the Pinkerton instruction itself, just viewed in isolation, is erroneous because it says the act needs to be committed and further into the conspiracy or be foreseeable to a conspirator. And it does seem to me that's problematic because foreseeability is a linchpin of Pinkerton. I mean, the defendant needs to have foreseen the crime. So I think part of the problem, though, is that was the prior pattern instructions did have that kind of language, but the new ones don't. So how do we deal with that? That's correct. Well, I mean, there's obviously circuit precedent. The law has now changed. I will say that the precedent which allowed that or the Fifth Circuit, it was a sole outlier, the total minority. There's five other jurisdictions which said it had to be in the conjunctive. You had to prove both. So you actually do have problems with both the aiding and abetting instruction and the Pinkerton instruction. And when you put those two in front of the jury together, it looks like the jury can say, oh, well, you know, if we're allowed to convict under Pinkerton if it's only foreseeable, and that Pinkerton instruction applies to counts, for example, 2 through 5, and then in the special instructions in 2 through 5, you have the aiding and abetting instruction, why would they not think that they could use that foreseeability to convict under the aiding and abetting? It doesn't look like alternate theories or alternate ways to convict. It looks like they can be read together. But didn't the instructions have that difference? No. Foreseeability for Pinkerton and not aiding and abetting? No. They were not presented as alternatives, Your Honor. They were presented, as I said, one was presented at the end of the conspiracy and then the other one was presented as a part of the main jury instructions for the candidates. How was the objection phrased to that instruction? I'm sorry? How was the objection stated to that instruction in that regard? Well, the objection was that the Pinkerton instruction was incorrect and that it was not supported by the facts or the law. And then the issue of the and and the or was brought up. So there were several places in the record where it was discussed. It was briefly discussed in the jury instruction conference, although, like I said before, that took place one day before the Rosemont decision was decided, issued. And then . . . Rosemont, of course, had to do with a weapon used in conjunction with a crime, didn't it? Right. That was a . . . Or a knowledge of the person having a gun. Right. There was a 924C case. Right. And actually, I only find one case . . . Quite different from this case. Yes, quite different. I agree. And there's only one case, really, where Pinkerton is applied in a health care fraud case that I can find. It's a Grant 683F3-639. It's a 2012 case. But that case doesn't help us here because there was no challenge to the Pinkerton instruction at all. It was given, but there was really no discussion of the propriety of it all. So, you have this possibility that the jury combined the two. I see my time's up. I'll quit. Thank you. Okay. Thank you. Mr. Riding? James Riding with Hildren Associates, and I represent Shukafei Akemi. I'm here to discuss what I believe is a grave issue with the charge. In this case, the defendants sponsored an employment safe harbor defense. They intended to argue this in closing. The court, however, at the government's insistence and over defendants' objections, included a paragraph at the end of the safe harbor instructions that was a mandatory conclusive presumption. And that paragraph read, if you find that any part of the payment to a defendant was to compensate past referrals or to induce future referrals, that portion of the payment violates the anti-kickback statute and is not subject to the safe harbor defense. This meets the classical definition of a mandatory conclusive presumption defined in Francis v. Franklin. Furthermore, I'd like to go on and say I want to make two points. One, that it affected all counts against Akemi, including the first count, having to do with conspiracy to commit Medicare fraud. And that is for the following reasons. First, the primary means by which the government alleged that she committed conspiracy to commit Medicare fraud was through an anti-kickback scheme. Second, the government argued in closing argument that the jury could infer from the fact that patients may have been paid that they didn't need the treatment. And third, the superseding indictment went back to the jury with this instruction in it. I also want to argue that this is not, with respect certainly to the anti-kickback charges, is not only a reversible error, it is structural error for the following reasons, having to do with Sullivan v. Louisiana. That is the case where the reasonable doubt instruction was misdescribed. Here, at the end of the safe harbor instruction, we have a mandatory conclusive presumption that does not require the jury to find predicate facts beyond a reasonable doubt. It alleviates the jury's responsibility to find any element of the charge. They do not have to find intent. They do not have to find that the payment for referrals went to, were for referrals for government-covered benefits. None of the elements of a kickback violation were required to be found by a reasonable doubt by this jury. Looking at the paragraph you're challenging, is your problem that the language that says that portion of the payment violates the anti-kickback statute? I mean, if it just said, if you find part of the payment to a defendant was made to compensate past referrals, then it's not subject to the safe harbor. Would you be okay if it just said the defense doesn't apply? Your Honor, I would not be okay if that was the situation. It's not a correct statement of Fifth Circuit law. It completely vitiates the defense. What's not correct about that? I mean, I understand there might be a problem with the, then the payment violates the statute, but why would, isn't it true that if it's made to compensate past referrals that that's, and there's all these multi-factors. That's a matter of fact. That's a matter of fact whether it was advertisement that was, that is compensatable by Medicare that induced the referrals. So it's a matter of fact. But the real problem, and I'd like to concentrate on it, is it says that portion of the payment violates the anti-kickback statute. Well, that I see where your concern is. And if you look at Sullivan, whether you're looking at Rehnquist's concurrence or Scalia's opinions, when they go down the list of what makes things, what differentiates a structural error, they point out, and I'll just start with Rehnquist's concurrences, he points out three things. One, an issue is whether the instruction resulted in or limited or restricted the defendant's ability to put on a defense. And certainly in this case it did. By putting on a safe harbor defense with this instruction, you are admitting guilt. If you said, yes, we got referrals, but it was in the course of employment and it's covered by the safe harbor instruction, you're guilty. Under this paragraph. But our case law says we always evaluate the jury instructions as a whole. And so assuming those, I think it's nine words or so, were a problem, the jury instructions clearly list each element of the anti-kickback statute. They say you have to have willful intent. Why would we have to assume that this overrode all those detailed instructions? The case that explains why this Court must is Francis v. Franklin. They were presented with the same argument by the government. That look, the rest of the charge is correct. And the point is really, Sandstrom error is enough for constitutional error. Sandstrom error is you do not have to prove that the Court erred twice. And in Francis v. Franklin they said the general instructions do not count for the fact that this instruction is clearly there. It's part of an important and central element of the case, the defendant's core defense. And this is how it destroyed it, completely destroyed it. So the real analysis is not whether the rest of the charge is correct. It's whether there's any reasonable likelihood that the jury would have applied this instruction, whether the jury would have said this tells me what the law is, this tells me there's been a violation of the anti-kickback statute just by the fact that there is a mere referral that was compensated for. And that's it. My job is done. So the other part of the analysis that courts have used, for example, in Corella, is determine whether there was the predicate facts, which is any part of the payment was for a referral, for example, was functionally equivalent to the elements. No, there's not. Another thing that the courts have looked to is whether they have been instructed that this is, say, a permissive inference and that they may conclude that this violates the anti-kickback statute. There is no such instruction. This is not a permissive inference. This tells the jury that you make these mere findings, and that's it. That's a violation of the statute. And I believe this is you can even look at the later cases in which, and again I'm turning again to harmful error, United States v. Knitter, and you look to see did this, when Rehnquist wrote that opinion, the court was going towards a, call it a Chapman, it was moving clearly to a Chapman standard for harmless error, and they said, but Rehnquist said, look, if the error affects the framework of the trial, then it can be a structural error, the entire framework. This certainly did. There's no reasonable, they don't have to find beyond a reasonable doubt. They don't have to find the elements. The other was, and the other element that is important, and again I'm turning to Sullivan, is whether this charge obviated the need to find any of the elements, or did it vitiate the jury's findings? It surely did. It gave them a way to make all the findings necessary to convict the defendants without having to go through the elements and carefully consider them. This did the job for them. My time is up? Yes. Thank you. All right. Mr. Goodhand. Good morning, Your Honors. David Goodhand for the United States. I'm happy to address any questions that the court has from my perspective. That's why I'm here, to deal with any questions you might have. One issue that came up in the course of defendants' arguments related to the suggestion that there might have been some evidentiary lapses with respect to sufficiency evidence with respect to defendant Nunn's count one conviction. That is, did Ms. Nunn know about the health care fraud? And I would point to several features of the record that I think demonstrate she did have that knowledge. One, she graduated her payments to patients, so she distinguished between PHP and IOP. I think that suggests a sophistication that belies any suggestion that she was ignorant. Number two, Nunn was constantly at the spectrum offices, and this court has said on several occasions, if you live in fraud, essentially, that is, if you day-to-day exist in fraud, then it can be inferred that you have knowledge of that fraud. Third, Ms. Nunn was compatriots with Mr. Roberts, who walked into court as a cooperating witness under a plea bargain, of course, but Roberts said everything that Spectrum was doing was false and fraudulent. Kickbacks, falsities, et cetera. So the connection between Nunn and Roberts, I would suggest, is another element to the piece in terms of knowledge of the health care fraud. The final piece of the puzzle to the knowledge for Ms. Nunn, I would suggest, is the precise matching up of the 10% that she got in payments that matched up to the Medicare billings received on the part of her patients. That's a perfect symmetry, I would suggest, between Medicare billings, fraudulent Medicare billings, on the one hand, and on the other hand, what we should and the jury can infer was her knowledge that falsities were relating to those claims. But you can't have a kickback scheme, which is illegal, even with perfectly valid Medicare claims. Absolutely. So to tie her to the falsity of those claims, is it right that you basically have her, in your view, heavy involvement in the kickbacks, her presence at the facility? I understand why the kickbacks can be evidence that you know of the fraud, but it seems your position is almost making it so that anyone guilty of a kickback conspiracy is going to be guilty of a Medicare fraud conspiracy. No, and I understand the distinction you're drawing, and I think we could imagine a hypothetical where kickbacks were paid but they had absolutely no idea there was health care fraud going on. But again, to me, one of the critical facts is that she's paying out different amounts to patients depending on whether or not they're in the PHP program or the IOP program. To me, that suggests that she knew exactly what was going on. PHP pays at a very high rate compared to IOP, and thus she graduated her kickback payments to the patients based on that distinction. Put that together with her constant presence at Spectrum, and in particular, there was a great deal of testimony talking about she was basically in Defendant Hakimi's office almost twice a day checking on her patients. That kind of sort of 24 hours, 7 days a week, present at the facility that is engaging in the Medicare fraud, I think this Court's case suggests permits a pretty significant inference of knowledge. Can you cite any cases where it's just the kickback involvement and being at the medical facility that is sufficient for health care fraud? I'm not sure I've seen that particular case, and in fact I think I know in the Eleventh Circuit there's a case that goes the opposite way that suggests what Your Honor is inferring or intimating is that no, kickback alone will not get you here. But again, I think we had, and the jury could in this highly deferential setting, conclude we had the requisite knowledge on the part of none. Does that make any difference to the conviction or the sentence? I mean, I know it does to the conviction, but what about to the sentence? Practical impact? No. None was convicted on both Count 1, which was the health care fraud, and Count 6, the kickback conspiracy. They were run concurrent, as I recall, to sentencing and judgment. Very quickly, with respect to the suggestion that the government ran roughshod over this community-based health center in executing the warrant, defense counsel made a couple of references to what the government did not take. Actually, the testimony at ROA 5425 is that they left behind over two and a half filing cabinets full of materials. Moreover, the record demonstrates the agents via the affidavit in support of the search warrant got an express order from the magistrate that the agents can view substance abuse files in ascertaining whether or not those are seizable or not. So, you know, that goes to good faith. These agents acted very carefully, and as we've outlined in our brief, the court's judgment on particularity is fully supported by the record. A couple points on the instructions, if I can move along. Number one, a lot of talk here about Pinkerton and the Pinkerton instruction. I may be wrong, and I'd be happy to be corrected on rebuttal, but if you look at ROA 9472-73, that was the only objection lodged with respect to the Pinkerton instruction, and that was an objection from Defendant Sanjar. He said, I've never seen a Pinkerton instruction applied to health care fraud cases. I would suggest that's a long way from the discussion that we are now having about whether or not Pinkerton somehow, A, subverts or undermines or diminishes the aiding and abetting mens rea, number one, and number two, whether there's this inconsistency or tension between the deliberate ignorance instruction on the one hand and the Pinkerton instruction on the other. So no matter what, I think as this Court looks at these questions, it should be mindful of that plain error standard. What about the language of the Pinkerton charge, which may be subject to plain error of view, but does the government acknowledge that you have to have foreseeability for a Pinkerton conviction? Yes. But the judge here said even if it's just in furtherance, then you don't need foreseeability because it was an or. Well, and my understanding is that's this Court's case law, is that it's an or. If the government thinks that's correct. I guess that's my question. Well, but again, if you're in plain error land and if you've got absolutely no authority contravening your position. I get that. I'm just curious what the government actually thinks as an initial matter. There was some questioning about the tension between deliberate ignorance and Pinkerton instruction. I think this Court's case in investment enterprises, I think, nicely answers that, and that's 10 F. 3rd, 263. There was a very similar claim raised there, that is that there was tension between the defendant could not be deliberately ignorant of the object of the conspiracy and also intend to further its purpose. And this Court said, no, what deliberate ignorance asks you to do is to use evidence of conscious avoidance to include, to infer knowledge. I don't think that gets to the specific intent that would otherwise be required for a finding of conspiracy. That is, you have to willfully, knowingly join the conspiracy with a specific intent to further its purpose. So anyway, I think in particular at page 269 of that decision, this Court nicely addresses that perceived tension. If I might, and again, I'm happy to address any questions. I'd like to turn to, if I might, the safe harbor instruction. There's been a lot of ink devoted to that. There was a lot of time devoted here to it. From the government's perspective, as we outlined in our brief, this is a perfectly permissible instruction to the extent that it mimics what this Court's case in datas calls is a statement of law. That is, the referral payment does not have to be solely for the purposes of gleaning Medicare patients. It can, even if it's also arguably for employment compensation, you're still running afoul of the anti-kickback statute. And that's Davis 132 F. 3rd at 1094. And what Davis said, very similar to what the defendants argued here, was that it's, quote, an erroneous statement of the law to suggest that a defendant is guilty if the jury finds only that the purpose was for a referral. Davis said that's an erroneous statement of the law. So what the Court did here, I would suggest, at the end of its instructions, first laying out the substantive violation of the anti-kickback statute, four elements, then laying out the safe harbor provision, preponderance of the evidence defendants must prove. The Court then essentially did what a court is allowed to do as a matter of law, defined the government's burden in establishing an element. I would suggest it was element two, the referral element, number one. And number two, constrained as a matter of law the scope of the safe harbor provision, a defense. Those two things are what happen all the time in courtrooms in terms of matter of law instructions from the jury. Final point, and then if there are any questions, that, I would suggest, is a big difference from this Court's case law in CESA. Where this Court had some problems with this instruction, quote, the commingling of illegal proceeds with legitimate business funds is evidence of intent to conceal. That is a court, stated broadly, mucking around in evidence-based inferences. That is factual decision-making on the part of the jury. That's not what this Court did. This Court clarified the government's burden with respect to the element two and clarified the scope, the lawful scope, of the safe harbor and defense. But reading it in isolation, I don't think there's a big problem if it just said if you find that any part of the payment was a referral, then it's not subject to the safe harbor. But it says then the payment violates the anti-kickback statute, and we all know there's various elements, including mens rea, you have to show. Isn't that violates the anti-kickback statute language a problem? No, because of what preceded it. And this Court, of course, as earlier referenced, looks at these in context. You can't assume that the jury just two pages before had heard the four elements of the kickback violation, including knowingly and willfully payment for Medicare services, and just threw that knowledge out the window when you got to that final sentence of the instruction. I would suggest that that was an appropriate place for that instruction because this instruction was doing double duty. It was defining the scope of the government's burden with respect to element two of the substantive violation and additionally doing duty with respect to the scope of the defendant's lawful affirmative defense. So in that respect, it was, I would suggest, a perfect coda to the elements of the offense, then the safe harbor definition, then, okay, here we are. This is what the government has to show. If there are any additional questions, I'd be happy to answer them. Otherwise— I want to ask about your cross appeal. Sure. What's the practical import of that? I mean, practically speaking, the government never even gets close to the restitution that's ordered. Yeah. I mean, just explain for us why this matters, basically. Sure. And that was actually the exact dialogue that went on at the sentencing hearing. The court said, well, look, I only think there's one victim here, the government writ large. And the court said, as a result, I'm going to order that any funds obtained through forfeiture shall be applied to restitution, sort of automatically invoking that offset. Practically speaking, I would say in 99.7% of the cases, that probably just doesn't become a problem, as this Court's decision in Taylor talks about. That is, if forfeiture from the AG is given, to the AG is given, then ultimately the AG will ultimately kick it over to restitution, and that's diminished. The government's core point, I hope this Court takes away from it, our cross appeal is this. That's the AG's authority. It's the sole authority of the AG. I would point to the statute, 21 U.S.C. 853i, but I also point to the Eleventh Circuit's decision in Joseph where the court was very clear. A district court generally has no authority to offset a defendant's restitution obligation by the value of forfeited property held by the government. The Allotte decision from the Fourth Circuit is to the same effect. The MVRA did not grant the district court discretion to reduce the amount of restitution required to be ordered by an amount equal to the value of the property seized. The point being, it's for the AG to ultimately decide. It will probably happen. I've gotten, you know, as was articulated in the sentencing hearing, the AUSA stood up and said this is what happens, practically speaking. The government's problem with this is that it's not the district court's authority. But again, it's a restitution to only one party, which is the government. Well, I think Taylor speaks to that issue. The district court did suggest that it was only one victim. But in Taylor, we had a very similar situation. We had forfeiture ordered, restitution ordered for FEMA fraud relating to Hurricane Katrina. The district court said, no, I'm going to order both restitution and forfeiture. And this Court affirmed in Taylor saying, well, FEMA is a distinct entity from the Department of Justice. Similarly, I would suggest Medicare and Medicaid, distinct entities from the Department of Justice. So the sort of core premise, I would suggest, of the district court's restitution offset was erroneous. There aren't, there is. I don't know how, whether this is of any importance. I was looking back through Taylor, as you may know, I was on the panel. Also references made to another victim, a nongovernment victim. I don't believe, Taylor doesn't talk about that. But there was a individual. A third party, I think. Right. A private party. Right. As I recall the facts, yes. I don't think that alters the analysis of whether or not when you order. It doesn't discuss that, but that is a distinction. It is. It is. But I think there's another case from the Seventh Circuit, same thing, without that third party complication. I think it's Emerson, actually. Restitution was ordered and forfeiture, and the victim was a post office, I believe. No third party implication there or complication. So I think those two authorities together stand for that proposition. Let me ask you a question based on a Medicare, I think it's Medicare fraud that we heard a month or two ago. In that case, the government claimed that there were multiple victims, which were the patients who were paid money to go to a clinic where nothing was done, and then fraudulent billing was submitted. And these victims came under provision of the sentencing guidelines because their personal information, their Medicare numbers, had been revealed during the course of the fraudulent conduct. I take it the government didn't make that argument here. No. No. Sounds bizarre, doesn't it? Just by the language of the MVRA, the proximate causation that's required and the scheme to defraud, to my mind, Medicare and Medicaid fall sort of in that heartland. I can't really speak to a factual pattern I'm not familiar with. I wouldn't either if I were you. Unless there are any further questions we would ask, this Court affirmed the convictions in the sentences, but with the cross appeal we would ask that you amend the judgments. Thank you. Thank you. Good morning. I represent Dr. Sajjadi. This is a complex case with lots of complex issues. Judge Costa, when you started asking about medical necessity, and it raises the issue of the necessity of an expert by the government to explain why there was no medical necessity in the treatment of these patients. By relying on Dr. Shiplett's analysis of the plan and explaining how this type of program should be administered without showing that it wasn't administered properly by an expert, shows that the jury is listening to patients' analysis of what their treatment was and how that treatment was improper, which begs the question of whether or not there was any medical necessity at all. Dr. Axelrod, the defense expert, reviewed all the files and said this treatment was proper. You can watch part of a movie and then discuss it, and that's proper treatment. Based on what was in the reports, though. He didn't meet with the patients. Right. Based on what's in the reports. And when you have a person who is mentally ill, many times they say, I am not mentally ill. I don't have to – I'm not depressed. I don't suffer from anxiety. Because they don't want to be ill. They want to view themselves as being normal. And so when they're explaining to a jury, I don't have these symptoms, but the medical records show these are the illnesses of this person. This is how sick they are. And to the district court then says, these people are crazy. Without that expert to say the treatment that was given to this patient was wrong. This treatment of watching a movie and then discussion isn't proper treatment. Without that expert to say, reviewing the records to say this is wrong, you don't have evidence of Medicare fraud. But then what about the problem? Well, you do if the payments are supposed to be for PHP status, and these patients are chronically mentally ill, and they're receiving treatment for long periods of time as opposed to the sort of the crisis mode care that I gather the PHP program envisions. The problem with the mentally ill. I'm quite familiar about that. The treatment, you need the expert to come in and say, when they're transferred from one program to the next and then back again. You need someone to say that that transfer of programs or this length of treatment wasn't proper. Now, you can't just say because of the length of treatment and assume, or as the government uses throughout its brief, infer. The jury could infer a conclusion that this treatment was improper. But this case says, deals with, there is no expert testimony. And throughout, we've cited in all the briefs, cases after case, where you can't have a ruling on medical treatment without an expert. In a civil case, you can't do it. Well, the question is not the precise treatment. That would be like the difference between deliberate indifference and just negligence. The question is, were they proper participants in this sort of program? And the government's expert, I suppose, had dealt with the parameters of that. You can't be challenging. You should have had two shots instead of one. Well, all he said, this is how I run my program at John Hopkins. This is what I do. This is my interpretation of the rules. He didn't say what was done here is improper. What the government then said, brought patients and say. They should have gone over and discussed every patient that had been treated during this multiyear endeavor. He could look at the patient files in the indictment. Those were all the patient files. There's only a few patient files, patients named in indictment. He could interview the patients that were there or talk to the therapists who provide treatment and testify that they did things properly. What do you do about all the evidence that the patient files were fabricated, they didn't actually meet with the doctors for 45 minutes, there was just a change in the dates, they were the same information for different patients? With that testimony, there are procedures in place, and it's cited in the briefs of 2013 notations to the register saying, when there's a problem in an audit, there's forms that are missing, pages are missing, you can go back and make corrections in files. And that goes, that doesn't necessarily, that does not do away with the problem of not explaining what the treatment was and that there was no medical necessity and there was fraud, actual fraud. The psychiatrist weren't actually meeting with these people to diagnose them, but it was just a mill. Well, the time limits for a 45-minute session does not necessarily mean that you have to see the person for 45 minutes. You can see them for 30 minutes or you can see them for an hour, depending on what is necessary to make the diagnosis. Some doctors can see a patient for 15 minutes and make an accurate diagnosis of what is the course of treatment. Or it may take two or three sessions before they can say what is the proper course of treatment. So that raises the question, how do you prove that in this type of case? You need someone to, an expert to look at some of the files, look at some of the procedures and not just draw conclusions. You just can't infer that because an expert says this is how I run my program, all programs should be run the same, which then sort of leads me to a question Judge Jones, you asked about harm in Agent Kirk's testimony. The government suggests that what was omitted from Kirk's testimony about Sanjar's statements was exculpatory evidence, exculpatory explanations and denials of criminal responsibility. You have to take that in the context of Agent Kirk used a document to refresh his memory. He had no independent memory of what took place like in Garcia. And then he used that document to refresh his memory, but then there was no cross-examination allowed to, with that same document of what else was said. And that's the purpose of 106, is to say when you use one document to testify from, you have to look at the complete document to show what else is there to place the context of what was said. What questions were being asked? What was he answering? How did it all fit together? And as Judge Gilmour said, the portion of his testimony was the basis of the deliberate instruction, deliberate ignorance instruction. So without that full context, even the district court drew conclusions that were harmful to all the defendants because no one was allowed to challenge the accuracy of what was being said in the context of what was being said and what was happening and what Dr. Sanjar was saying as he explained his program, which goes to the medical necessity, which goes to the entirety of the trial, which then leads me to a red light. I'm sorry. On and on and on. I thank you. We have three court-appointed lawyers here, Ms. Jarman, Mr. Esmeyer, and Ms. Schmucker, and we certainly appreciate your service to the court getting into a difficult case like this, so we'll look at it very closely. Thank you very much. Thank you.